ESTATE OF MAX STRAUSS, ALSO KNOWN AS MARX STRAUSS, DECEASED, MARJORIE F. TREGANOWAN, EXECUTRIX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 17372. Promulgated August 5, 1949.

160

*Howard O. Colgan, Jr., Esq.*, for the petitioner.
*Rigmor O. Carlsen, Esq.*, for the respondent.

HILL, *Judge*: Respondent determined a deficiency in estate tax against the petitioner in the amount of $5,883.93. The only question presented is whether the amount of $20,000 or any part thereof received by the decedent's widow pursuant to a provision of the constitution of the New York Stock Exchange is includible in the gross estate of the decedent under section 811 (g) of the Internal Revenue Code.

The facts were stipulated and they are so found.

This proceeding is brought by Marjorie F. Treganowan, executrix of the last will and testament of the decedent, Max Strauss, also known as Marx Strauss. The estate tax return involved was filed with the collector of internal revenue for the third district of New York.

Decedent was born in 1886. He died September 11, 1944.

On January 15, 1925, decedent was elected a member of the New York Stock Exchange (hereinafter referred to as the Exchange) and was thereafter a member until his death.

In 1873 the Exchange adopted a plan providing for the payment by the surviving members of a certain sum to the families of deceased members. At the time the plan was instituted in that year a constitutional amendment was adopted by the Exchange enjoining the governing committee of the Exchange (now the board of governors) :

\* \* \* to increase the surplus revenues of the Exchange as far as possible by rigid economy of expenditures, and by increase of receipts in every legitimate way, for the purpose of accumulating a fund to be styled the "Gratuity Fund" to be administered and applied as directed in the Constitution of the Exchange.

The constitution also provided that no alteration in any essential particular "shall ever be made" to that part of the constitution providing for payment to the families of deceased members.

The constitution of the New York Stock Exchange, which contains all the provisions concerning the gratuity fund involved, is incorporated herein by this reference.

The constitution provides that before anyone may be admitted to membership in the Exchange he shall pay to the trustees, which consist of the chairman of the board of governors and six members of

the Exchange elected by the members, of the gratuity fund the sum of $15. By the constitution the member also:

* * * pledges himself to make, upon the death of a member of the Exchange, a voluntary gift to the family of each deceased member in the sum of fifteen dollars, which shall be paid by the member at quarterly periods on the dates on which dues to the Exchange are to be paid. * * *

Section 3 of article XVI of the constitution states:

Sec. 3. The faith of the Exchange is hereby pledged to pay, within one year after proof of death of any member, out of the money collected under the provisions of this Article, the sum of twenty thousand dollars, or so much thereof as may have been collected, to the persons named in the next Section as therein provided, which money shall be a voluntary gift from the other members of the Exchange, free from all debts, charges or demands whatever.

Section 5 provides:

Sec. 5. Nothing herein contained shall ever be taken or construed as a joint liability of the Exchange or its members for the payment of any sum whatever; the liability of each member, at law or equity, being limited to the payment of fifteen dollars only on the death of any other member, and the liability of the Exchange being limited to the payment of the sum of twenty thousand dollars, or such part thereof as may be collected, after it shall have been collected from the members, and not otherwise. * * *

It is further provided that the sum shall be paid to the widow and children, or issue of a deceased child or children of the deceased member, or, if he died leaving neither widow, child, nor issue of a child, then to his legal heirs or the persons who, under the laws of the State of New York, would take the sum by reason of relationship to the deceased member if he owned it at the time of his death. No member has at any time had the right to name, select, or designate any beneficiary or beneficiaries other than those named above or in any other way to divert the benefits from the persons specified in the constitution. At all times since the adoption of the plan of 1873, the constitution of the Exchange has contained a provision (article XVI, section 6) similar to the following:

Sec. 6. Nothing herein contained shall be construed as constituting any estate in esse which can be mortgaged or pledged for the payment of any debts; but it shall be construed as the solemn agreement of every member of the Exchange to make a voluntary gift to the family of each deceased member, and of the Exchange, to the best of its ability, to collect and pay over to such family the said voluntary gift.

Section 5 of Article X provides that if any contribution due to the Exchange, which includes the contribution to the gratuity fund, is not paid by any member within 45 days after it becomes due, he:

* * * shall be reported by the Treasurer to the Chairman of the Board and, after written notice mailed to him of such arrearages, may be suspended by the Board of Governors until payment is made.

Should payment not be made within one year after payment is due, the membership of the delinquent may be disposed of by the Board, on at least ten days' written notice mailed to him at his address registered with the Exchange.

The amendments to the constitution can be made by submitting the proposed amendment to the board of governors, which either approves or disapproves the proposal. After approval by the board, the amendment is submitted to the full membership for vote. If more than 688 of the 1,374 members vote within the time prescribed and if a majority of those express a preference for the proposed amendment, it becomes part of the constitution.

In the early period of the fund it was built up in four ways: (1) From an initial payment of $10 by each member of the Exchange and each person who was thereafter admitted to membership; (2) from allocation to the fund of half the annual profits of the Exchange in excess of $10,000; (3) from the excess of the amounts collected from surviving members over the amount paid to the kin of deceased members (which was originally $10,000) ; and (4) from the accumulation of interest on the invested capital of the fund. In 1896 the allocation to the fund of half of the annual profits in excess of $10,000 was terminated. In 1915 the accumulation of the income of the fund was terminated and thereafter the net income was credited pro rata to the members of the Exchange in reduction of the amounts payable by them on the deaths of other members.

On March 26, 1941, a constitutional amendment was adopted providing for the use of both capital and income of the fund as a credit against amounts otherwise payable by surviving members so long as the value of the fund should remain in excess of $500,000. During the period from January 15, 1925, to January 1, 1941, the trustees of the gratuity fund at the close of each fiscal or calendar year paid over to the treasurer of the Exchange the annual net income received as interest on the gratuity fund, which in turn was credited pro rata to the members of the Exchange as of the first day of the succeeding fiscal or calendar year and applied in reduction of amounts payable by each member in respect of the deaths of other members.

During the period from January 1, 1941, through July 19, 1945, the date on which the decedent's membership in the Exchange was transferred by the executrix, the trustees of the fund paid to the treasurer of the Exchange at the close of each quarterly period the aggregate of all amounts paid or payable by members of the Exchange under the provisions of the constitution in respect of deaths occurring during such quarter and the treasurer of the Exchange credited those amounts proportionately against the amounts so paid or payable by each member in respect of the deaths of members occurring during that quarter.

From January 15, 1925, through January 10, 1941, the gross amounts payable by decedent in respect of deaths of other members of the

Exchange amounted to $3,185. During the same period the amounts credited to the decedent amounted to $1,024.52.

From January 11, 1941, through September 11, 1944, when decedent died, the gross amounts payable by decedent in respect of deaths of other members of the Exchange amounted to $795. During the same period the amounts credited to decedent, as above stated, amounted to $795. From September 11, 1944, through July 19, 1945, the gross amounts payable by decedent's estate in respect of deaths of other members amounted to $255. During the same period the amounts credited to the decedent's estate in accordance with the above amounted to $255.

Adele L. Strauss, the widow of decedent, received the sum of $10,000 by check dated October 16, 1944, issued by the "Trustees of the Gratuity Fund" of the Exchange, and also received the further sum of $10,000 by check dated July 9, 1945, issued by the "Trustees of the Gratuity Fund" of the Exchange.

In a statement attached to the notice of deficiency respondent stated as follows:

It is determined that the death benefit paid by the Gratuity Fund of the New York Stock Exchange is includible as part of the decedent's gross estate within the provisions of Section 811 (g) of the Internal Revenue Code.

Whether the $20,000 involved should be included in decedent's gross estate under section 811 (g) of the Internal Revenue Code depends, first, upon whether that amount is proceeds of life insurance and, second, upon whether such insurance was purchased with premiums or other consideration, paid directly or indirectly by the decedent, or whether decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person with respect to that insurance. Respondent contends that all of those elements are present with respect to the amount here involved.

We do not agree with respondent that the $20,000 involved represented proceeds of life insurance within the meaning of section 811 (g). We have reached this conclusion despite our *dicta* in *Central Hanover Bank & Trust Co., Executor*, 40 B. T. A. 268,[1] which involved the same gratuity plan before us and section 302 (g) of the Revenue Act of 1926, which was later incorporated into the code as section 811 (g), that "the Exchange may have been 'engaged in the business of life insurance upon the cooperative or assessment plan' within the purview of the New York statute."

In the first place, the characterization of amounts as insurance by state courts has no binding effect upon the interpretation of section

[1] In that case we held that payments from the New York Stock Exchange Gratuity Fund were not includible in the gross estate of a deceased member, since decedent had no legal interest in the policy which terminated at his death. The respondent acquiesced in that decision. 1939–2 C. B. 6.

811 (g). Paul, Federal Estate and Gift Taxation, vol. 1, § 10.07, footnote 1; *Kernochan* v. *United States*, 89 Ct. Cls. 507; 29 Fed. Supp. 860, 866; certiorari denied, 309 U. S. 675; *Estate of Stuart Wilson*, 42 B. T. A. 1196, 1200.

The Supreme Court of the United States, in *Helvering* v. *Le Gierse*, 312 U. S. 531, considered the meaning of insurance as used in section 811 (g). In that case the Court was concerned with section 302 (g) of the Revenue Act of 1926, as amended, which, as above mentioned, later became section 811 (g) of the Internal Revenue Code. The Court stated that it had found little assistance in the construction of the word "insurance" in the section involved in either the legislative history or the Treasury regulations (Regulations 105, section 81.25) and stated:

Necessarily, then, the language and the apparent purpose of § 302 (g) are virtually the only bases for determining what Congress intended to bring within the scope of the phrase "receivable as insurance". In fact, in using the term "insurance" Congress has identified the characteristic that determines what transactions are entitled to the partial exemption of § 302 (g).

We think the fair import of subsection (g) is that the amounts must be received as the result of a transaction which involved an actual "insurance risk" at the time the transaction was executed. *Historically and commonly insurance involves risk-shifting and risk-distributing.* That life insurance is desirable from an economic and social standpoint as a device *to shift and distribute risk of loss from premature death* is unquestionable. That these elements of risk-shifting and risk-distributing are essential to a life insurance contract is agreed by courts and commentators. See for example: *Ritter* v. *Mutual Life Ins. Co.*, 169 U. S. 139, * * * *In re Walsh, D. C.*, 19 F. Supp. 567; *Guaranty Trust Co.* v. *Commissioner*, 16 B. T. A. 314; *Ackerman* v. *Commissioner*, 15 B. T. A. 635; Couch, Cyclopedia of Insurance, Vol. I, § 61; Vance, Insurance, § 1–3; Cooley, Briefs on Insurance, 2d edition, Vol. I, p. 114; Huebner, Life Insurance, Ch. 1. *Accordingly, it is logical to assume that when Congress used the words "receivable as insurance" in § 302 (g)* [now section 811 (g)] *it contemplated amounts received pursuant to a transaction possessing these features.* * * * [Italics supplied.]

See also *Keller* v. *Commissioner*, 312 U. S. 543.

Since the *Le Gierse* decision the courts have uniformly held that where there are no features of risk-shifting or risk-distributing present any amount received can not be designated insurance within the scope of section 811 (g), *supra*. *Goldstone* v. *United States*, 325 U. S. 687, 690; *Seward's Estate* v. *Commissioner*, 164 Fed. (2d) 434, 437; *Chew's Estate* v. *Commissioner*, 148 Fed. (2d) 76, affirming *Estate of William Douglas Chew, Jr.*, 3 T. C. 940; certiorari denied, 325 U. S. 883; *Knight* v. *Finnegan*, 74 Fed. Supp. 900; *Estate of William J. O'Shea*, 47 B. T. A. 646, 652. Cf. *Estate of Charles H. Thieriot*, 7 T. C. 1119, 1128.

In *Central Hanover Bank & Trust Co.*, *supra*, page 271, we said: "* * * there is nothing to indicate that an insurance or investment

risk was undertaken by the exchange or its members * * *." No additional evidence was presented in this proceeding to show that any risk against the probability of premature death was assumed by the Exchange. There was no agreement between it and the decedent whereby, in consideration of payments by each member of a named sum, it pledged or stipulated the payment of a larger sum on the death of any member. The Exchange's only obligation is to pay over what it collects from the members to the family of a deceased member, that is, to pay $20,000 "or such part thereof as may be collected * * *." See section 5 of article XVI of the constitution, set forth in part in the findings. Neither the health nor the age of the member nor his living habits are taken into account in determining the member's payments. The Exchange does not require the passing of a physical examination as a condition of participation in the gratuity plan. The amount of the gift made by each member to the kin of a deceased member is not fixed with reference to his life expectancy as determined by the mortality tables. Certainly, some of these elements must exist in the purported contract of insurance before any amounts payable thereunder may be deemed "proceeds of insurance" or "receivable as insurance" within the purview of section 811 (g), *supra*, as that section was construed by the Supreme Court in the *Le Gierse* case, *supra*. See also *Ritter* v. *Mutual Life Insurance Co.*, 169 U. S. 139, cited with approval in the *Le Gierse* case, *supra*. In accordance with the above, therefore, we believe that the amount involved was not "receivable as insurance" in the statutory sense.

The respondent implicitly admits in his brief that the elements of risk-shifting and risk-distributing must be present before the proceeds involved may be designated insurance within the scope of section 811 (g), citing *Helvering* v. *Le Gierse*, *supra*, but claims that those elements as set forth by the Supreme Court in that case are present here. He states on brief that:

The case at bar comes squarely within the above definitions of life insurance. Each member of the Exchange was required to make certain specified payments toward the fund at designated times in the nature of premiums; the death of each member, an uncertain event, was the occasion of the payment to his widow, children or heirs of a specified amount; * * *

Respondent fails to recognize, however, that the insurance risk associated with a contract of life insurance is the "risk of loss from premature death," as stated by the Supreme Court in the *Le Gierse* case, not of death itself. Any risk of loss from premature death is not present in the case at bar, for the reasons above stated. In addition, as pointed out above, the exchange was not required to pay a "specified amount"; instead, it was obligated to pay $20,000 or such part thereof as may be collected from the members.

In further support of his argument, respondent cites a number of New York cases involving the teachers' retirement system of that state, which, he states, serve to qualify the character of the death benefits under discussion as insurance. As pointed out above, state law as to what constitutes insurance is not controlling for the purpose of construing section 811 (g), *supra*. In addition the New York case of *In re Fitzsimmons' Estate*, 158 Misc. 789; 287 N. Y. 171, states in part as follows :

A review of the provisions of the Teachers Retirement Law (Greater New York Charter, § 1092, as amd.) and its operation discloses a close similarity of the benefits to ordinary insurance. The use of mortality tables is authorized and an actuary is employed to compute the contributions to be made by a member of the system and the benefits payable at the death of a member.  *  *  *

It is thus apparent that the benefits from that plan are "a device to shift and distribute risk of loss from premature death  *  *  *." *Helvering* v. *Le Gierse, supra.*

In view of our conclusion, it is not necessary to discuss the payment of premiums or incidents of ownership tests of section 811 (g).

It follows that respondent erred in his determination.

Reviewed by the Court.

*Decision will be entered for petitioner.*

---

OPPER, *J.*, dissenting: Modern level-premium life insurance contracts issued by great companies engaged primarily in that business have become so commonplace that the contention can now be made, and apparently with success, that nothing else is "life insurance." I venture to suggest, however, that neither legal authority nor ordinary usage justifies even today so narrow a construction of the term.

The definition resorted to here is that contained in *Helvering* v. *Le Gierse*, 312 U. S. 531. Since the Supreme Court was there construing the very language in the very provision of law with which we are here confronted, that seems an eminently appropriate point of departure.

But having, in reliance upon the language of that case, reached the proposition that insurance "historically and commonly" should involve "risk-shifting and risk-distributing," the present opinion proceeds to rule out those essential factors because there was no agreement for payment "by each member of a named sum" (a stipulated premium), no agreement by the Exchange to pay more than it collects from assessments on the participating membership (a principal sum), no physical examination, and no determination of the assessment payable by the surviving members upon the decease of a participant "with

reference to his life expectancy as determined by the mortality tables. Certainly," the opinion reasons, "some of these elements must exist * * * before any amounts * * * may be deemed 'proceeds of insurance' * * *."

Logically, "historically," and "commonly," I can not agree that any of these elements is essential to the "risk-shifting" and "risk-distributing" aspect of life insurance, which the *Le Gierse* case—and indeed the present opinion—seize upon as its distinguishing characteristic.[1] Risk of death, or for that matter of "premature death," if there is any distinction, is shifted and distributed here automatically as in any assessment insurance.

Whenever death occurs to any member, young or old, its financial impact is softened by the contributions of his associates. That is the sharing, or distributing. The risk, of course, is that death will come sooner than savings equal to his assessments would have built up an equivalent fund. Otherwise he could protect himself. Some may eventually pay more in assessments than their estates can receive. That is the other side of the risk. It is necessarily present in all insurance. And that the Exchange acted merely as collecting agent from the members, who were the real participants, bound at least as firmly by the Exchange's constitution as by any life insurance policy, is again a historical element of assessment insurance. The Exchange member "pledges himself" in a "solemn agreement" to pay. If all keep that agreement, the full death benefit will be received. No life insurance policy is proof against breach.

That Congress used the term "life insurance" in its commonly accepted meaning would be a reasonable conclusion even without the *Le Gierse* case to support it. But that case links "common" and "historic" in a context whose significance can not be escaped. As late as 1936, long after Congress first used the term, Webster's New International Dictionary (2d Ed.) defined "life insurance" in part as:

> *Life insurance or assurance.* A contract of insurance based upon the life of a person. * * * Life insurance paid upon the death of the insured in whole or in part from the proceeds of an assessment levied upon the members of an association for that purpose is called *assessment life insurance.*

And the craft, guild, or trade union concept of insurance, based upon a common occupation and following assessment principles, is not only a historic and fundamental form of life insurance, but ap-

---

[1] For example, in referring to the necessity of a physical examination, *Keller* v. *Commissioner*, 312 U. S. 543, says:

"Absence of a physical examination may well be inconclusive as to the existence of an insurance risk. For example, some companies do not require such an examination for group insurance. But there the risk as to one is distributed among the group, an insurance risk squarely within the definition stated in the La Gierse case. * * *"

pears actually to be one of its origins. Thus the latest (1948) edition of the Encyclopedia Britannica, under the subject of "Life Insurance," refers to:

The principle that groups of persons should agree to make common cause against dangers which threaten all, but are individual in operation * * *. Action of this nature was moreover, in its origin, dictated by the interest of the group rather than by the interests of its members. As communications became more widely organized, the character of the group granting the benefit naturally tended to become that of a class or trade union, but until what are historically known as modern times, insuring associations were associations of persons, not of capital, and insurance of members would only have been one of their reasons for existence. * * *

Even more illuminating is the Encyclopedia of Social Sciences (1935), vol. 9, p. 462:

* * * In the second century of the Christian era the Roman *collegia* built up funds to provide burial for their members; and some insurance of this sort, often connected with crafts or guilds, has been maintained in many communities from that time to the present day. * * *

*        *        *        *        *        *        *

Life insurance * * * has two principal origins. * * * The second origin is in the craft guilds. From earliest times men of similar occupation or with common interests bound themselves together in friendly association. Members were helped in sickness and old age, and burials were arranged. On the death of a member it became customary to seek charitable donations on behalf of the family. This charitable practise developed into a right, and each surviving member was assessed a fixed sum for each death. In some cases the contributions were made definite, and the amount was distributed among the beneficiaries. Out of these practises arose the early forms of life insurance along assessment lines. * * *

In the light of this "common" and "historic" concept of life insurance, I find it impossible to concur in the elimination of assessment life insurance from the statutory definition. But there is still another reference in the *Le Gierse* case which can not be avoided. That is the "apparent purpose of § 302 (g)," now 811 (g). By his participation in the death benefit fund, and his contributions as required by its terms, decedent procured the payment to his beneficiaries at his death of a sum which has the same relation to his estate that any other life insurance would have. It would take unmistakable language in the statute to convince me that such a discrimination was intentional. Since the statute not only expresses no purpose to exclude this type of life insurance, but, on the contrary, the term used is actually susceptible only of a meaning which embraces it, I would sustain the deficiency.

TURNER, *J.*, agrees with this dissent.