### COMMISSIONER OF INTERNAL REVENUE v. TREGANOWAN.

#### No. 211, Docket 21583.

United States Court of Appeals Second Circuit.

Argued May 1, 1950.

Decided June 6, 1950.

Writ of Certiorari Denied Oct. 16, 1950. See 71 S.Ct. 82.

Carlton Fox, Special Assistant to Attorney General, and C. Oliphant, Washington, D. C. (Theron Lamar Caudle, Assistant Attorney General, and Ellis N. Slack and Robert N. Anderson, Special Assistants to Attorney General, on the brief), for petitioner.

Timothy N. Pfeiffer, of New York City (Milbank, Tweed, Hope & Hadley, Weston Vernon, Jr., Howard O. Colgan, Jr., Rebecca M. Cutler, and Robert L. Woodford, all of New York City, on the brief), for respondent.

Before L. HAND, Chief Judge, and CHASE and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The Commissioner of Internal Revenue here seeks review of a decision of the Tax Court, 13 T.C. 159, two judges dissenting, which expunged a deficiency he had assessed against the taxpayer executrix on the ground of her failure to include the proceeds of life insurance in the gross estate of her decedent for the computation of the estate tax. The governing statute is Int.Rev.Code, § 811(g)(2), as amended in 1942, 26 U.S.C.A. § 811(g)(2), which makes includible in the gross estate the "proceeds of life insurance" to the extent of the amount receivable by beneficiaries "as insurance under policies upon the life of the decedent (A) purchased with premiums, or other consideration, paid directly or indirectly by the decedent, in proportion that the amount so paid by the decedent bears to the total premiums paid for the insurance, or (B) with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person." The sum in question, claimed by the Commissioner but denied by the Tax Court majority to be the proceeds of insurance, is $20,000 paid to the decedent's widow on his death by the "Trustees of the Gratuity Fund" of the New York Stock Exchange.

From 1925 until his death in 1944, decedent was a member of the New York Stock Exchange. Since 1873 the Exchange has had a plan providing for the payment by the surviving members of a certain sum to the families of deceased members. The constitution of the Exchange sets up for this purpose a Gratuity Fund and provides that before any one may be elected to membership in the Exchange he must make a contribution to the Gratuity Fund of $15. By the constitution the member also "pledges himself to make, upon the death of a member of the Exchange, a voluntary gift to the family of each deceased member in the sum of fifteen dollars." The constitution also pledges the faith of the Exchange to pay, out of these assessments, $20,000, or so much thereof as may have been collected, to the persons named in the next section of the document. The persons there named were the widow and children of the member or issue of a deceased child or children, or if he died leaving neither widow, child, nor issue of a child, then to his legal heirs or the persons who would, under the laws of New York, take the same by reason of relationship to him had he owned the same at the time of his death. No member has at any time had the right to name, select, or designate any beneficiary or beneficiaries other than those named above, nor may the proceeds be assigned or pledged for the payment of any debt.

Although the constitution provides that the beneficiaries of a deceased member are to receive the full $20,000 only if that amount is collected, practically it is certain that the full amount will be paid. Under Art. X, § 5, of the constitution of the Exchange, members are subject to loss of their

seats for failure to meet any assessment, including the contribution due on decease of a member. When the assessments against all 1374 living members are met, the Exchange has actually received $610 more than is necessary to cover the payment of $20,000; thus default of more than forty members would be required before the benefit would be decreased, and in fact the full amount has invariably been paid. Moreover, the Fund itself has reached such an amount that the Exchange in 1941 took steps for its reduction by the device of foregoing such contributions.

This happy state of financial stability came about because of quite generous support of the fund in the past. In its early period the fund was built up in four ways: (1) from an initial payment of $10 by each member of the Exchange and a similar payment—later increased to $15—from each person thereafter admitted to membership; (2) from allocation to it of half the annual profits of the Exchange in excess of $10,000; (3) from the excess of the amounts collected from surviving members over the amount paid to the kin of deceased members; and (4) from the accumulation of interest on the invested capital. In 1896 the allocation to the fund of half of the annual profits in excess of $10,000 was terminated. In 1915 the accumulation of the income was terminated and thereafter the net income was credited pro rata to the members of the Exchange in reduction of the amounts payable by them on the deaths of other members. On March 26, 1941, a constitutional amendment was adopted providing for the use of both capital and income of the fund as a credit against amounts otherwise payable by surviving members so long as the value of the fund should remain in excess of $500,000. See Franklin v. Dick, 262 App.Div. 299, 28 N.Y.S.2d 426, affirmed 287 N.Y. 656, 39 N.E.2d 282, which discusses the operation of the fund and sustains the validity of the 1941 amendment. The credits from the surplus in the fund, which had built up to almost $2,000,000, were enough to cover all the assessments from January 1, 1941, until beyond the time when decedent's executrix sold his seat.

Hence no direct payments of assessments were made by him, or by his executrix, during this period.

■ "Insurance" is not defined by statute, and Treasury interpretation of the term has never gone beyond a statement that § 811(g) is applicable to "insurance of every description, including death benefits paid by fraternal beneficial societies operating under the lodge system." Treas.Reg. 105, § 81.25, 26 C.F.R. 81.25. In deciding whether the $20,000 paid to decedent's widow is insurance within the statutory meaning, the Tax Court looked, rather naturally, to the test announced in the leading case of Helvering v. Le Gierse, 312 U.S. 531, 539, 61 S.Ct. 646, 649, 85 L.Ed. 996, that "historically and commonly insurance involves risk-shifting and risk-distributing." The Tax Court concluded that the Exchange's plan does not shift the risk of premature death, and that the plan is not insurance. With this conclusion we cannot agree.

In the Le Gierse case the Court, resolving a conflict in the lower courts, denied the benefit of the $40,000 exemption then allowed for the proceeds of life insurance to the receipts upon death under an ingenious transaction whereby an uninsurable prospect did obtain a policy of life insurance. The device was the purchase by the uninsurable risk (in the particular instance a woman of 80) of both a life insurance and a life annuity contract upon the payment of single premiums for each, sufficient together to avoid all loss by the insurer; for the nature of these contracts is such that, whatever the time of death, any loss upon one will be necessarily offset by the gain on the other. The Court therefore held that when the two contracts were put together there was no "insurance risk." The holding really highlights the situation here where the payment is actually conditioned upon death, whenever occurring, in the true terms of insurance. "From an insurance standpoint there is no risk unless there is uncertainty or, to use a better term, fortuitousness. It may be uncertain whether the risk will materialize in any particular case. Even death may be considered fortuitous, because the time of its occurrence is beyond control." 8 Ency.Soc.Sc. 95. That fortuitous-

ness, whether we speak of death generally or premature death, as the Tax Court wished to emphasize, seems perfectly embodied here to fit both branches of the Supreme Court's test. As a critical commentator on the decision below well states it: "Risk shifting emphasizes the individual aspect of insurance: the effecting of a contract between the insurer and insured each of whom gamble on the time the latter will die. Risk distribution, on the other hand, emphasizes the broader, social aspect of insurance as a method of dispelling the danger of a potential loss by spreading its cost throughout a group. By diffusing the risks through a mass of separate risk shifting contracts, the insurer casts his lot with the law of averages. The process of risk distribution, therefore, is the very essence of insurance." Note, The New York Stock Exchange Gratuity Fund: Insurance That Isn't Insurance, 59 Yale L.J. 780, 784.

Here the risk of loss from premature death is effectively shifted from the individual to the group of other members of the Exchange. If the individual member dies prematurely, the amount paid to his kin will exceed the amount of assessments which he himself has paid in, the difference representing the loss caused by his premature death which the group has had to bear. Had he not been a member of the plan, he would have saved the amount of assessments against him before his death, but his beneficiaries would be $20,000 poorer. Thus they would have borne this loss which, through the Exchange plan, he has shifted to the group. And manifestly this plan provides a distribution of the risk, for because of the plan the risk of premature death is borne by the 1373 other members of the Exchange, rather than by the individual.

The Tax Court stressed such matters as the lack of adjustment of premiums to health or age or living habits of the member, of any requirement as to the passing of a physical examination, of any fixing of the amount of the "gift" with reference to his life expectancy as determined by the mortality tables. But these do not appear to be essentials.[1] As Judge Opper well said, in dissenting for himself and Judge Turner in the Tax Court: "Modern level-premium life insurance contracts issued by great companies engaged primarily in that business have become so commonplace that the contention can now be made, and apparently with success, that nothing else is 'life insurance.' I venture to suggest, however, that neither legal authority nor ordinary usage justifies even today so narrow a construction of the term." Here over the years and by a system of actual trial the cost of the plan had been equated with the required contributions as successfully as more detailed analyses of the risks might have provided. In fact, the plan here carried out is in essence the assessments for death charges made by the ancient guilds on their membership, from which the origin of life insurance has been traced, 9 Encyc. Soc.Sc. 462; Encyc.Britannica 1948, tit. Life Insurance, and still employed by mutual benefit and fraternal societies, though their popularity has diminished in the last half century. These plans provide that living members make payments whenever a member dies, rather than periodically, with the payments equal for all members of the group, regardless of their life expectancy. These plans have always been understood to be insurance, see, e. g., Commonwealth v. Wetherbee, 105 Mass. 149, 161, and are so considered with regard to § 811(g). T.D. 5239, 1943 Cum.Bull. 1081, 1092.

The finding that this plan is insurance does not alone ensure taxability of the sum in question here, for the other requirements of the statute must also be fulfilled. The insurance must result from contracts wherein the insured either "possessed at his death any of the incidents of ownership" or which he had "purchased with pre-

1. Thus in Estate of Keller v. C. I. R., 312 U.S. 543, 545, 61 S.Ct. 651, 652, 85 L.Ed. 1032, the companion case to Le Gierse, the Court said: "Absence of a physical examination may well be inconclusive as to the existence of an insurance risk. For example, some companies do not require such an examination for group insurance. But there the risk as to one is distributed among the group, an insurance risk squarely within the definition stated in the Le Gierse case."

miums, or other consideration, paid directly or indirectly by the decedent." Int. Rev.Code, § 811(g)(2), supra. And the Revenue Act of 1942, § 404(c), 56 Stat. 944, 26 U.S.C.A. § 811 note, in stating that the new amendments shall apply only to the estates of decedents dying after their enactment, goes on to provide that if a decedent possessed no incidents of ownership after January 10, 1941, the proceeds of the insurance are includible in the gross estate only to the extent of the ratio which the premiums subsequent to that date bear to the total premiums paid.[2] Hence respondent contends that, even though the sum in question be considered the proceeds of insurance, it is wholly excludable, since her decedent possessed no incidents of ownership in the contract and paid no premiums during the critical period. Were we to agree with her first contention—that "incidents of ownership" by the deceased were lacking —we should still feel that the amounts advanced from the Gratuity Fund during this period in his behalf ($1,050 out of a total of $4,235 assessed against him during his period of membership) constituted the payment of consideration at least indirectly by him, so as to require the inclusion of the proceeds to the extent of the ratio thus indicated. See Treas.Reg. 105, § 81.27, 26 C.F.R. 81.27(a) (2). But a majority of the court is of the view that the deceased member did possess some at least of the incidents of ownership so as to render the entire sum taxable.

The phrase "incidents of ownership," as used in § 811(g)(2)(B) of the Code and in § 404(c) of the Revenue Act of 1942, is defined in the report of the House Ways and Means Committee accompanying the 1942 Act: "There is no specific enumeration of incidents of ownership, the possession of which at death forms the basis for inclusion of insurance proceeds in the gross estate, as it is impossible to include an exhaustive list. Examples of such incidents are the right of the insured or his estate to the economic benefits of the insurance, the power to change the beneficiary, the power to surrender or cancel the policy, the power to assign it, the power to revoke an assignment, the power to pledge the policy for a loan, or the power to obtain from the insurer a loan against the surrender value of the policy. Incidents of ownership are not confined to those possessed by the decedent in a technical legal sense. For example, a power to change the beneficiary reserved to a corporation of which the decedent is sole stockholder is an incident of ownership in the decedent." H.R:Rep.No.2333, 77th Cong., 2d Sess. 57, 163. The report of the Senate committee which considered the bill and added the amendment as to applicability of § 404(c) is even more comprehensive along the same lines. Sen.Rep.No.1631, 77th Cong., 2d Sess. 235. And see Treas. Reg. 105, § 81.27, as amended by T.D. 5239, 43 Cum.Bull. 1081, 1094, now appearing in 26 C.F.R. 81.27(a) (7) and (b) (2), upon which these reports appear to have been framed and which states, *inter alia,* that the term "is not confined to ownership in the technical legal sense" and includes "for example, the right of the insured or his estate to its [the policy's] economic benefits."

From both the broad language used and its inclusive interpretation, it is thus clear that such powers as to receive the surrender value of insurance or to put another in one's place as the insured are incidents of ownership. An Exchange member does have the power to sell his seat, thus divesting his beneficiary of any right to payments, and entitling the purchaser to the same insurance which the seller has had. This power to cancel one's own engagement and substitute another seems to us an incident of ownership, within the statutory meaning. The purchase price of a seat on the Exchange is necessarily the

2. The choice of the date, January 10, 1941, by the legislators is thus explained by the Commissioner in his brief: "January 10, 1941, is the date on which Article 27 of Treasury Regulations 80 (1937 ed.) was amended by T.D. 5032 (1941-1 Cum.Bull. 427, 429), so as to provide that, where the insurance was taken out prior to January 10, 1941, it was includible in the decedent's gross estate to the extent that he had paid the premiums thereon, if thereafter he possessed any 'incidents of ownership.'"

sum of the value of the bundle of rights which such a seat compromises. One of these rights is that of having the sum of $20,000 paid to his family upon a member's death. Thus the seller receives a cash consideration, however difficult to evaluate, for terminating this insurance. It seems impossible to distinguish this consideration from the surrender value paid upon cancellation of an old line level premium insurance policy. As a matter of fact, there are indications that retention of membership in an exchange may turn upon the value of this potential death benefit; this has been stated, for example, as the experience of the Midwest Stock Exchange with reference to a similar plan. Note, 59 Yale L.J. 780, 785 n. 30. Thus, the analogy between the economic return for selling an exchange seat and that for cashing in a traditional insurance policy is therefore too close to be ignored.

Considering the matter along somewhat broader lines, the result must be the same. It is contrary to our theories of property to conceive of a valuable right such as this without ownership somewhere; and since the member has the control over it, he is the natural one to whom to ascribe such right. Even though ownership be not complete for all purposes—i. e., his bundle of rights be less than some assumed total—that does not require rejection of the concept; we are well accustomed to various forms of impairment or inseparable joining of rights, as because of physical connection, e. g., a house and land, or of legal status, e. g., a joint or community ownership of husband and wife, or of limited creation or extent, e. g., the nonassignable annuities considered in United States v. Drescher, 2 Cir., 179 F.2d 863. We are unwilling to hold this right ownerless, cf. 1 Restatement, Property, c. 1 and § 10, 1936; Morris Plan Industrial Bank of New York v. Schorn, 2 Cir., 135 F.2d 538, 540, and n. 4, or at least that decedent failed to possess *any* of the incidents of ownership.

The decision must therefore be reversed for reinstatement of the deficiency assessment.

L. HAND, Chief Judge (dissenting in part).

In the first form of the "Gratuity Fund" each member agreed to pay $10 every time another member died, and the members collectively agreed that half the profits of the Exchange should also contribute. The promise to make the $10 payments was like the "premium notes" of old mutual fire insurance companies, in which each member assumed a limited liability for the loss suffered by any one, the result of which was to spread his loss over all. These companies were always considered insurance companies; and insurance is usually regarded as essentially the ratable distribution over all members of a group of a payment which becomes due to some one of them upon a future occasion not predictable in time or in occurrence. The respondent's argument, as I understand it, is that in the tax statute the word should be limited to conventional life insurance, based upon adequate actuarial bases, and perhaps limited by the exclusion of bad risks. That appears to me must too circumscribed a reading of the phrase: "Insurance of every description." Back of the statute lies the purpose, I think, to include in a man's estate whatever provision he may have made for his successors, which depends upon his death, and which he has secured by means of "premiums" or "other considerations," paid during his life. Such contracts are a form of saving, and it is of no importance whether they are mutual arrangements, or arm's length bargains with companies who are in the business. Now that the "Gratuity Fund" has become so large that the payments are made out of its income, the similarity to ordinary life insurance has become less; just as it was at the outset so far as concerned the contribution of half the profits of the Exchange. But that did not change the result. When a member buys his seat, he buys an interest in the "Fund," which is nothing more than security for the obligation which he assumes to pay $15 every time another member dies. True, it has become practically certain that he will never be called upon to pay—the security is large enough; but even though

we were to take the "Fund" as an absolute discharge of the obligation, I should still call the payment upon his death insurance. The member would be paying a single premium when he bought his seat, because his purchase gives him an interest in the "Fund" which is to be used to meet the payment. I should liken that to a single payment "term" policy, if the "term"— instead of being measured in a fixed number of years—were measured by the period during which the member kept his seat. So far, therefore, I am at one with my brothers.

I would, however, limit the amount to be included in the gross estate to that proportion which the premiums paid after January 10, 1941, bears to all premiums paid while the member had his seat; and by premiums, I mean those successive charges of $15 which were debited against his interest in the "Fund." That these debits were "premiums," or at least "other considerations," follows from what I have already said; and I think that a member has no "incidents of ownership" in the "insurance" while he lives. Nobody has been able to suggest any such incident except that, if he sells the seat, he sells his interest in the "Fund," and that this interest will presumably figure in the price that he gets for the seat. I assume as much; indeed, I can conceive that an old member in bad health might decide not to sell just because of his interest in the "Fund"; or that a young unmarried member, confident of exceptional prospective longevity, might be induced to sell chiefly for the same reason. But we are not dealing with words in vacuo, stripping them of the connotations which their context imposes. I agree that the grantee of a power to sell Whiteacre and Blackacre together, but not separately, has an "incident of ownership" in each; but when we apply that phrase to insurance, it should take on an insurance meaning, so to speak. I think the phrase covers those policies which the insured has reserved some power to change; it means that he can change the beneficiary; that he can borrow on them; that he can surrender them; that he can influence their obligation by acts directed to them alone. It

does not mean, I submit, that he can affect them by transactions in which they are at best only an incident, and a relatively unimportant one at that. But, however, that might be if we had no more than the bare words, it appears from the House Report that this interpretation is that which Congress had in mind. True, "it is impossible to include an exhaustive list"; but the examples given are all of the kind I mention; they are of powers reserved in the policy; they do not suggest a power which can be exercised only by including an interest of much greater moment. I would include only about one-fourth of $20,000 in the estate.