ESTATE OF CLARENCE L. MOYER, DECEASED, C. LEIGH MOYER, JR., EXECUTOR, AND LENA W. MOYER, WIDOW OF CLARENCE L. MOYER, DECEASED, ET AL.,[1] PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 59017, 69041, 71324, 71325, 71378, 71379, 71386, 71393.  Filed May 29, 1959.

---

[1] The cases of the following petitioners were consolidated herewith: Gratuity Fund of Philadelphia-Baltimore Stock Exchange and Trustees of Gratuity Fund, Docket No. 69041; Charles B. Barclay and Katharine B. Barclay, Docket No. 71324; Estate of William K. Barclay, Deceased, Charles B. Barclay, Executor, Docket No. 71325; William K. Barclay III, a minor, H. Gilroy Damon, Guardian, Docket No. 71378; Oscar Doyle Johnson and Marian B. Johnson, Docket No. 71379; Estate of William K. Barclay, Jr., Deceased, Charles B. Barclay, Co-Executor, Fidelity-Philadelphia Trust Company, Co-Executor, and Maxine W. Darby, Co-Executor and Surviving Spouse (Formerly: Maxine W. Barclay), Docket No. 71386; and Virginia B. Bentley, Docket No. 71393.

*Joseph W. Price 3d, Esq.*, for all petitioners.

*Howard H. Yocum, Esq.*, for the petitioners in Docket Nos. 59017 and 69041.

*Paul D. Ritter, Esq.*, for the respondent.

WITHEY, *Judge:* The respondent determined deficiencies in tax of the petitioners as follows:

| Docket No. | Petitioner | Kind of tax | Year | Deficiency |
|---|---|---|---|---|
| 59017 | Estate of Clarence L. Moyer, Deceased, C. Leigh Moyer, Jr., Executor, and Lena W. Moyer, Widow of Clarence L. Moyer, Deceased. | Income | 1950 | $1,968.32 |
| 69041 | Gratuity Fund of Philadelphia-Baltimore Stock Exchange and Trustees of Gratuity Fund. | Income | 1953 | 886.66 |
| | | | 1954 | 4,678.94 |
| | | | 1955 | 5,745.59 |
| 71324 | Charles B. Barclay and Katharine B. Barclay | Income | 1954 | 376.86 |
| 71325 | Estate of William K. Barclay, Deceased, Charles B. Barclay, Executor. | Estate | | 6,615.35 |
| 71378 | William K. Barclay III, a minor, H. Gilroy Damon, Guardian. | Income | 1954 | 253.41 |
| 71379 | Oscar Doyle Johnson and Marian B. Johnson | Income | 1954 | 207.49 |
| 71386 | Estate of William K. Barclay, Jr., Deceased, Charles B. Barclay, Co-Executor, Fidelity-Philadelphia Trust Company, Co-Executor, and Maxine W. Darby, Co-Executor and Surviving Spouse (Formerly: Maxine W. Barclay). | Income | 1954 | 708.08 |
| 71393 | Virginia B. Bentley | Income | 1954 | 654.24 |

Issues presented for decision are the correctness of the respondent's action (1) in determining that the Gratuity Fund of the Philadelphia-Baltimore Stock Exchange is a taxable entity separate and apart from the Exchange, (2) in determining that the Gratuity Fund is a trust and taxable in accordance with the provisions of the Internal Revenue Codes of 1939 and 1954 relating to trusts, (3) in disallowing deductions taken by the Gratuity Fund for payments or distributions made by the Fund to distributee-beneficiaries of deceased members of the Exchange, (4) in determining that such distributions or payments constituted, in whole or in part, taxable income to the distributee-beneficiaries, (5) in including in the gross income of the Gratuity Fund sums paid to the Fund by members of the Exchange at the time of their admission to membership in the Exchange, (6) in determining that payments or distributions made by the Gratuity Fund to distributee-beneficiaries on account of the death of William K. Barclay were includible in the gross estate of the decedent, and (7) in disallowing in a determination of the net estate of William K. Barclay, deceased, a portion of the deduction taken for administration expenses.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly. Clarence L. Moyer died June 14, 1950, leaving surviving him his

wife, Lena W. Moyer. The joint Federal income tax return for Clarence L. Moyer and Lena W. Moyer for 1950 was filed with the collector of internal revenue in Philadelphia, Pennsylvania.

The trustees of the Gratuity Fund of the Philadelphia-Baltimore Stock Exchange filed their Federal fiduciary income tax returns for 1953, 1954, and 1955 with the district director in Philadelphia, Pennsylvania.

Charles B. Barclay and Katharine B. Barclay are husband and wife and filed their joint Federal income tax return for 1954 with the district director in Philadelphia, Pennsylvania.

William K. Barclay died July 29, 1954, and the Federal estate tax return for his estate was filed with the district director in Philadelphia, Pennsylvania.

William K. Barclay III is a minor and his Federal income tax return for 1954 was filed by his guardian, H. Gilroy Damon, with the district director in Philadelphia, Pennsylvania.

Oscar Doyle Johnson and Marian B. Johnson are husband and wife and filed their joint Federal income tax return for 1954 with the district director in Philadelphia, Pennsylvania.

William K. Barclay, Jr., died March 19, 1954, leaving surviving him his wife, Maxine W. Barclay (now Maxine W. Darby). The joint Federal income tax return for William K. Barclay, Jr., and Maxine W. Barclay for 1954 was filed with the district director in Philadelphia, Pennsylvania.

Virginia B. Bentley filed her Federal income tax return for 1954 with the district director in Philadelphia, Pennsylvania.

The Philadelphia-Baltimore Stock Exchange (formerly the Philadelphia Stock Exchange), sometimes hereafter referred to as the Exchange, is an unincorporated association organized about 1790 in the city of Philadelphia, Pennsylvania, for the purpose of providing an auction market for trading in securities by its members. Since its formation the Exchange has conducted a security exchange. At all times material hereto it was duly registered with the Federal Securities and Exchange Commission and conducted its operations in Philadelphia.

The Exchange operates under and is governed by a constitution and the rules of its board of governors. The constitution provides for three classes of members, designated full, special, and associate. Since the cases involved here are concerned only with matters relating to full members, the terms "member" and "members" as used hereinafter will refer only to a full member or full members, respectively. The constitution limits the number of members of the Exchange to 200 and at all times relevant herein there were 200 members.

The expenses of operation of the Exchange are provided for by dues, income from investments, fees, and service charges.

518

The establishment of a Gratuity Fund was recommended to the board of governors of the Exchange in November 1875. Provisions relating to a Gratuity Fund were made part of the constitution of the Exchange by adoption on July 12, 1876. Since that date the constitution of the Exchange has provided for a Gratuity Fund and such Fund has been operated exclusively to provide benefits upon the death of a member of the Exchange. The maintenance of the Gratuity Fund is and has been since 1876 a constitutional requirement of the Exchange. Every person elected to membership is required to sign the constitution before being admitted to the privileges of membership. By such signature he pledges himself to abide by the constitution as it has been or shall be from time to time amended and by all rules and regulations adopted pursuant to the constitution. Every person elected to membership is required to pay the Exchange an initiation fee of $500 within 5 days after his election. Otherwise his election is void. Only members of the Exchange are entitled to the benefits provided by the Gratuity Fund.

The Gratuity Fund is controlled by five trustees, composed of the president and vice president of the Exchange and three other members of the Exchange appointed by the board of governors of the Exchange. The president and the members of the board of governors are elected by the members of the Exchange at annual elections. The vice president is appointed by the board of governors.

The trustees of the Gratuity Fund receive the payments made to the Fund, invest the money of the Fund in such securities as they deem proper, and make payments from the Fund. The trustees generally meet quarterly to pass upon the investments of the Fund and also meet upon the death of a member of the Exchange for the purpose of paying death benefits to the beneficiary or beneficiaries of such deceased member.

The funds and assets of the Exchange and of the Gratuity Fund are separately held, under separate custody and control, and are accounted for in separate books and records. The assets in the Gratuity Fund consist of securities and cash and are held in a custodian account by the Girard Trust Corn Exchange Bank, Philadelphia, Pennsylvania, in an account entitled "Philadelphia-Baltimore Stock Exchange, Gratuity Fund, Girard Trust Corn Exchange Bank, Custodian for Trustees." All receipts and disbursements of the Gratuity Fund are reflected in this account.

Since the establishment of the Gratuity Fund, its funds have been derived from transfers of amounts from the Exchange, amounts payable to the Gratuity Fund by members of the Exchange at the time of their admission to the Exchange, and sometimes hereinafter referred to as Gratuity Fund initiation fees, dues, payments made to the Gratuity Fund by members of the Exchange upon the death of

other members of the Exchange, and income from invested funds.

Transfers of funds from the Exchange to the trustees of the Gratuity Fund have been made as follows:

(a) On April 7, 1881, the proceeds of the sale of 15 memberships in the Exchange in the amount of $75,600.

(b) On December 1, 1913, pursuant to a resolution of the board of governors of the Exchange, 50 per cent of the dues of the Exchange for 1914 was made payable to the trustees of the Gratuity Fund. By reason thereof the Fund received a total of $11,100 during 1914.

(c) On May 1, 1918, securities of a then market value of $50,000.

Since the creation of the Gratuity Fund in 1876, the provisions of the constitution of the Exchange regarding payments to the Gratuity Fund of annual dues of members of the Exchange, Gratuity Fund initiation fees, amounts payable by members upon the death of another member of the Exchange as well as the benefits payable by the Gratuity Fund upon the death of a member have varied from time to time. The following is a tabular statement of the provisions relating to the foregoing items during the various periods since 1876 to the present time:

| Period | Annual dues payable to Gratuity Fund | Gratuity Fund initiation fees | Amounts payable to Gratuity Fund upon death of a member | Death benefits payable by Gratuity Fund upon death of a member |
|---|---|---|---|---|
| July 12, 1876, to Sept. 27, 1886. | $15 | $15 | $10 | $2,000. |
| Sept. 27, 1886, to June 1893. | $15 | $100–$750 (depending upon age at admission). | $15 | $4,000. |
| June 1893 to Apr. 2, 1906. | $15 | $125–$950 (depending upon age at admission). | $15 | $5,000. |
| Apr. 2, 1906, to May 20, 1912. | None | $150–$1,140 (depending upon age at admission). | $20 | $7,500. |
| May 20, 1912, to May 1, 1918. | None | $200 plus $50 for each year of age over 21 up to 51 years of age, and $100 for each year of age over 51. | $20 | $7,500. |
| May 1, 1918, to Mar. 15, 1944. | None | $100 | $20 | $7,500 for members admitted prior to May 1, 1918. $4,000 for members admitted after May 1, 1918. |
| Mar. 15, 1944, to present time. | None | $100 | [1] $20 | $7,500 for members admitted prior to May 1, 1918. $4,000 for members admitted after May 1, 1918, and prior to May 1, 1944. $3,500 to $1,000 for members admitted to membership after May 1, 1944, depending upon age at admission. |

[1] Waived since 1949.

All Gratuity Fund initiation fees and all payments to be made by a member of the Exchange upon the death of another member coming due to the Gratuity Fund are charges against the membership of each member and are collected in the same manner and have the same priority as all fines, dues, assessments, and charges due from members to the Exchange. A member who neglects to pay his dues

or a fine or a contribution required to be made to the Gratuity Fund for 3 months after the same shall become payable shall be reported by the secretary of the Exchange to the board of governors and after due notice may be suspended until payment is made. Should payment not be made within 1 year after payment is due, the membership of the delinquent may be disposed of by the Exchange's committee on admissions.

If at any time the trustees of the Gratuity Fund deem the fund insufficient to protect the interest of the then-surviving members of the Exchange with respect to whose death, benefits of $7,500 each are payable by the Gratuity Fund, the trustees shall notify the board of governors who shall transfer from the Exchange to the Gratuity Fund the amount declared by the trustees to be necessary for such protection.

Since April 1906 the constitution of the Exchange has required that every member upon the death of another member pay to the Gratuity Fund the amount of $20. However, since March 1944, the constitution has provided that if the assets of the Gratuity Fund are sufficient to pay any gratuity payable upon the death of a member of the Exchange without reducing such assets below $300,000, the payment of $20 shall be waived. Since 1949 the assets in the Gratuity Fund have been in excess of $300,000 and payments by members upon the death of another member have been waived.

Since March 1944 the constitution of the Exchange has required that every member upon admission to membership pay to the Gratuity Fund a Gratuity Fund initiation fee of $100. The following is a statement of the total amount of Gratuity Fund initiation fees received by the Gratuity Fund for the indicated years:

| | |
|---|---|
| 1950 | $1, 300 |
| 1951 | 1, 200 |
| 1952 | 500 |
| 1953 | 600 |
| 1954 | 1, 000 |
| 1955 | 1, 000 |

Since 1949 the receipts of the Gratuity Fund have been from initiation fees and income from investments. The following is a statement of the income received by the Gratuity Fund from investments during the indicated years:

| | |
|---|---|
| 1950 | $13, 973. 99 |
| 1951 | 14, 479. 00 |
| 1952 | 14, 102. 33 |
| 1953 | 15, 081. 64 |
| 1954 | 15, 568. 86 |
| 1955 | 17, 320. 87 |

During each of the years here involved the total gross receipts of the Gratuity Fund from all sources were less than $75,000.

The constitution of the Exchange provides that the trustees of the Gratuity Fund, within 30 days after the death of any member of the Exchange, shall pay, out of the Gratuity Fund, either to the widow of the deceased member or to his child or children, or to the issue of deceased children, or among the widow and child or children and issue of a deceased child or children, as they (the trustees) may determine in their own discretion, or if no widow or child or issue of a deceased child or children survive, then to such person or persons designated in writing, signed and deposited by the deceased member with the trustees of the Gratuity Fund, the amount payable under the constitution with respect to the death of the deceased member. The constitution also provides that the amount so payable shall not be the property of any member for any purpose whatsoever, that such amount shall be paid clear and free of all assessments and claims of every kind whatsoever, and that in no case shall any interest be payable or demandable thereon.

Payments made by the Gratuity Fund, in accordance with the provisions of the constitution of the Exchange by reason of the death of members of the Exchange, were as follows for the indicated years:

1950 _____ $14, 000
1951 _____ 27, 500
1952 _____ 11, 500
1953 _____ 4, 000
1954 _____ 19, 000
1955 _____ 19, 500

The following is a statement of the financial condition of the Gratuity Fund at the end of the years 1950 through 1955:

| | 1950 | 1951 | 1952 | 1953 | 1954 | 1955 |
|---|---|---|---|---|---|---|
| *Assets* | | | | | | |
| Cash | $15, 295. 97 | $23, 746. 71 | $9, 753. 87 | $18, 714. 46 | $11, 576. 18 | $40, 022. 09 |
| Accrued interest receivable | | | 55. 90 | | | |
| Dividends receivable | | | | 185. 00 | | |
| Investments (at cost) | 323, 275. 22 | 306, 919. 16 | 318, 842. 48 | 318, 795. 73 | 318, 037. 95 | 287, 148. 96 |
| Total assets | 338, 571. 19 | 330, 665. 87 | 328, 652. 25 | 337, 695. 19 | 329, 614. 13 | 327, 171. 05 |
| *Liabilities and capital* | | | | | | |
| Liabilities: | | | | | | |
| Accounts payable | | | | | | 670. 00 |
| Benefits payable to beneficiaries of deceased members of the Exchange | 8, 000. 00 | 11, 750. 00 | 8, 000. 00 | 4, 000. 00 | 4, 000. 00 | 4, 000. 00 |
| Capital | 330, 571. 19 | 318, 915. 87 | 320, 652. 25 | 333, 695. 19 | 325, 614. 13 | 322, 501. 05 |
| Total liabilities and capital | 338, 571. 19 | 330, 665. 87 | 328, 652. 25 | 337, 695. 19 | 329, 614. 13 | 327, 171. 05 |

The Gratuity Fund does not maintain any fund or reserve computed or estimated on the basis of recognized mortality or morbidity tables to provide for the payment of death benefits upon the death of a member of the Exchange. Neither does the Gratuity Fund main-

tain a reserve exclusively to provide for the payment of death benefits upon the death of a member nor does it deposit any sum with any State or territorial officers.

A member of the Exchange may transfer or sell his membership to a candidate for membership approved by the board of governors of the Exchange. Upon such disposition by a member of his membership, his rights or benefits with respect to the Gratuity Fund terminate. The transferee or purchaser of the membership acquires only such rights or benefits with respect to the Gratuity Fund as the constitution of the Exchange provides with respect to persons currently becoming members.

The death of a member does not terminate the Exchange but the deceased member's membership may be transferred to a candidate for membership approved by the board of governors of the Exchange. When a member dies his membership also may be disposed of by the Exchange's committee on admissions.

The membership of a member of the Exchange, who has been suspended for insolvency and who fails to obtain reinstatement, may be disposed of by the Exchange's committee on admissions.

The expulsion of a member from the Exchange terminates all rights and privileges arising out of his membership except the right to have the proceeds received by the Exchange's committee on admissions from the sale of his membership applied as provided in the constitution of the Exchange and payment made to him of any remaining surplus.

Clarence L. Moyer became a member of the Exchange on January 23, 1912, and remained a member until his death on June 14, 1950. Following his death the trustees of the Gratuity Fund in 1950 paid to Lena W. Moyer the sum of $7,500 representing the payment to which she as his widow was entitled under the provisions of the constitution of the Exchange.

In the Federal estate tax return filed for the Estate of Clarence L. Moyer, the payment of $7,500 was reported as insurance and included as a part of the gross estate. However, the return disclosed no Federal estate tax due and the record does not disclose that any Federal estate tax was ever assessed against or paid by the estate.

No part of the above-mentioned payment of $7,500 was reported as income in the joint Federal income tax return of Clarence L. Moyer and Lena W. Moyer for 1950. The respondent determined that the Gratuity Fund constituted a trust, that the distribution of $7,500 to Lena W. Moyer in 1950 constituted income taxable to her and accordingly added that amount to the taxable income disclosed by the return.

William K. Barclay became a member of the Exchange prior to May 1, 1918, and remained a member until his death on July 29, 1954. Following his death the trustees of the Gratuity Fund in 1954 paid the sum of $7,500 to the following persons in the indicated amounts, rep-

resenting the payments to which they were entitled under the constitution of the Exchange:

| | |
|---|---:|
| Charles B. Barclay, son of William K. Barclay | $1,500 |
| H. Gilroy Damon, guardian for William K. Barclay III, a minor child of a deceased son of William K. Barclay | 1,500 |
| Marian B. Johnson, daughter of William K. Barclay | 1,500 |
| Virginia B. Bentley, daughter of William K. Barclay | 1,500 |
| Diana Louyse Barclay, child of a deceased son of William K. Barclay | 500 |
| Georgia Anne Barclay, child of a deceased son of William K. Barclay | 500 |
| John Kennedy Warfield Barclay, child of a deceased son of William K. Barclay | 500 |
| Total | 7,500 |

No part of the above-mentioned sum of $7,500 was reported in the Federal estate tax return filed for the Estate of William K. Barclay. In determining the deficiency in estate tax of that estate the respondent determined that the $7,500 was includible in the gross estate under the provisions of section 811(g)(2) of the 1939 Code and included the amount in the gross estate as life insurance.

In determining the deficiency in estate tax against the Estate of William K. Barclay, the respondent determined that $16,479.07 of a deduction taken for administration expenses was not deductible in determining the net estate and disallowed that amount. Of the foregoing $16,479.07, the amount of $15,426.15 represented administration expenses.

No portion of the above-mentioned payments of $1,500 made in 1954 by the trustees of the Gratuity Fund to Charles B. Barclay, H. Gilroy Damon, guardian for William K. Barclay III, Marian B. Johnson, and Virginia B. Bentley was reported as income in their respective Federal income tax returns for 1954. In determining the deficiencies in income tax for 1954 against the foregoing persons, the respondent determined that the Gratuity Fund constituted a trust, that the distributions to those persons, respectively, to the extent of $1,108.42 constituted taxable income to them and added that amount to the taxable income disclosed by their respective returns.

William K. Barclay, Jr., became a member of the Exchange after May 1, 1918, and prior to May 1, 1944, and remained a member until his death on March 19, 1954. Following his death the trustees of the Gratuity Fund in 1954 paid to Maxine W. Darby (formerly Maxine W. Barclay) the sum of $4,000 representing the payment to which she, as his widow, was entitled under the provisions of the constitution of the Exchange.

No part of the above-mentioned payment of $4,000 was reported as income in the joint Federal income tax return of William K. Barclay, Jr., and Maxine W. Barclay for 1954. The respondent determined that the Gratuity Fund constituted a trust, that of the distribution of

$4,000 to Maxine W. Barclay the amount of $2,955.80 constituted income taxable to her, and accordingly he added the latter amount to the taxable income disclosed by the return.

In the Federal fiduciary income tax returns filed by the Gratuity Fund for 1953 and 1954 no portion of the Gratuity Fund initiation fees totaling $600 and $1,000 received by the Fund in the respective years was reported as income. The respondent determined that those amounts constituted taxable income and accordingly added them to the taxable income disclosed by the returns for the respective years. In its Federal fiduciary income tax return for 1955 the Gratuity Fund included as income initiation fees totaling $1,000 received in that year. In determining the deficiency for 1955 the respondent made no change with respect to this item.

In the Federal fiduciary income tax returns filed by the Gratuity Fund for 1953, 1954, and 1955, deductions of $1,475, $19,000, and $19,500, respectively, were taken with the explanation that the amounts were paid in settlement of claims during the respective years. The respondent determined that the foregoing amounts were not deductible as expenses of the trust and accordingly disallowed them.

OPINION.

The first question for determination is whether the Gratuity Fund of the Philadelphia-Baltimore Stock Exchange is a trust and taxable as such under the provisions of the Codes of 1939 and 1954 relating to trusts.

In support of his determination that the Gratuity Fund is a trust and taxable as such, the respondent relies on *Philadelphia-Baltimore Stock Exchange*, 19 T.C. 355. In that case the Exchange for 1944, as it had done for prior years, reported in a single income tax return all of its receipts and all of the receipts of the Gratuity Fund and took deductions on behalf of both itself and the Fund. A question presented was whether for the year 1944 the Exchange was entitled to deduct as ordinary and necessary business expenses an amount of approximately $34,000 representing payments made during the year by the Gratuity Fund to beneficiaries of deceased members of the Exchange. In the alternative the Exchange contended that it was entitled to a deduction on account of payments made from the Gratuity Fund to the extent it, the Exchange, reported in the single income tax return the income from investments of the Gratuity Fund. There the material facts as to the origin, character, conduct, and operation of the Gratuity Fund were not substantially different from those presented here with respect to the Fund. We determined that the Exchange was not entitled to any deduction. In so doing we held that, pursuant to its constitution and bylaws, the Exchange many years ago created a trust, that the

trust has since maintained a Gratuity Fund for the sole purpose of paying death benefits to beneficiaries of deceased members of the Exchange, that the Gratuity Fund was a trust held and administered by duly authorized trustees, as fiduciaries, that the Exchange and the Gratuity Fund were separate entities, and that their operations should be treated separately for Federal income tax purposes. In the course of our discussion we stated that the Gratuity Fund was taxable as a trust under the provisions of section 161 of the 1939 Code.

The petitioners herein concede that the Exchange and the Gratuity Fund are separate entities and that for income tax purposes their operations are to be treated separately. However, they contend that since the taxpayer involved in *Philadelphia-Baltimore Stock Exchange, supra*, was the Exchange, the question of the nature and character for tax purposes of the Gratuity Fund was not before us, that our holding there as to the character of the Fund and how the Fund was to be taxed was not necessary to a disposition of the question before us and consequently is without any binding force on the Fund in its case here. We think the contention of the petitioners is well founded and accordingly conclude that the statement that the Fund there as a trust was taxable under the provisions of section 161 of the 1939 Code is without any force or effect on the case of the Fund here.

Citing *Morrissey* v. *Commissioner*, 296 U.S. 344, and relying on the holdings in *Commissioner* v. *Marjorie F. Treganowan, Executrix, Estate of Max Strauss*, sometimes hereinafter referred to as *Commissioner* v. *Treganowan*, 183 F. 2d 288 (C.A. 2), reversing 13 T.C. 159, certiorari denied 340 U.S. 853, and *Estate of William E. Edmonds*, 16 T.C. 110, the petitioners contend that the Gratuity Fund is an association engaged in the sole business of maintaining insurance on the lives of the members of the Exchange.

Section 3797(a)(3) of the 1939 Code and section 7701(a)(3) of the 1954 Code contain identical definitions of the term "corporation" as used in those Codes, namely, "The term 'corporation' includes associations, joint stock companies, and insurance companies."

Both the petitioners and the respondent rely upon *Morrissey* v. *Commissioner, supra*, for a statement of the characteristics of a trust which is an association within the statutory definition of a corporation. In that case the Supreme Court pointed out that the principal characteristics of an "association" are (1) associates who enter into a joint enterprise for the transaction of business and the sharing of the gains and profits therefrom, (2) vesting in the trustees of title to the property used in the enterprise, (3) designation of the trustees as a continuing body, (4) centralized management, (5) security of the enterprise from termination or interruption by the death of the owners of the beneficial interest, (6) facility of

transfer of beneficial interest without affecting the continuity of the enterprise and the introduction of large numbers of participants, and (7) limitation of personal liability of the participants to the property embarked in the enterprise.

In *Commissioner* v. *Treganowan, supra,* the decedent was a member of the New York Stock Exchange for a number of years prior to and at the time of his death. The members of that Exchange are required by the constitution of the Exchange to pay $15 to the trustees of a fund, designated a gratuity fund, upon being admitted to member-ship in the Exchange and to make a payment of $15 to the gratuity fund upon the death of another member of the Exchange. Upon death of any member, the Exchange is pledged to pay, out of the moneys so collected, the sum of $20,000 to certain beneficiaries desig-nated in the constitution. Failure to continue as a member of the Ex-change until death terminates all rights in the fund. At decedent's death, his widow was paid $20,000 by the trustees of the gratuity fund. Concluding that there was no element of risk distributing or risk shifting presented in the provisions of the constitution of the Exchange relating to the gratuity fund, we held that the amount re-ceived by the decedent's widow did not constitute the proceeds of insurance under policies on the life of the decedent within the scope of section 811(g) of the 1939 Code. On appeal by the respondent to the Court of Appeals for the Second Circuit our holding was re-versed. In reversing our holding the Court of Appeals took the view that under the arrangement the risk of loss from the death of an individual member of the group was shifted from the individual to the group of other members of the Exchange and that there was provision for risk distributing because the risk of death was borne by the other members of the Exchange, rather than by the individual. In holding that the arrangement or plan established by the constitu-tion of the Exchange was insurance, the Court of Appeals said:

In fact, the plan here carried out is in essence the assessments for death charges made by the ancient guilds on their membership, from which the origin of life insurance has been traced, 9 Encyc. Soc. Sc. 462; Encyc. Britannica 1948, tit. Life Insurance, and still employed by mutual benefit and fraternal societies, though their popularity has diminished in the last half century. These plans provide that living members make payments whenever a member dies, rather than periodically, with the payments equal for all members of the group, re-gardless of their life expectancy. These plans have always been understood to be insurance, see, e.g., Commonwealth v. Wetherbee, 105 Mass. 149, 161, and are so considered with regard to § 811(g). T.D. 5239, 1943 Cum. Bull., 1081, 1092.

Being of the opinion that the payment to the decedent's widow re-sulted from a contract wherein the decedent possessed at his death such incidents of ownership as brought the payment within the pro-visions of section 811(g) of the 1939 Code, as amended by section 404

of the Revenue Act of 1942, the Court of Appeals held that the payment to the widow was includible in the decedent's gross estate as insurance under policies upon the life of the decedent.

In *Estate of William E. Edmonds, supra,* the decedent was a member of the New York Stock Exchange for a number of years prior to and at the time of his death. At decedent's death his widow and his five children were paid a total of $20,000 by the trustees of the gratuity fund of the Exchange. The material facts in that case being substantially the same as in the case of *Commissioner* v. *Treganowan, supra,* we accepted the decision of the Court of Appeals for the Second Circuit in that case as correctly setting forth the legal principles applicable in the *Edmonds* case and held that the $20,000 in question was insurance under policies upon the life of the decedent and that under the provisions of section 811(g)(2) of the 1939 Code the amount was includible in the gross estate of the decedent.

In all pertinent respects the arrangement established by the constitution of the Philadelphia-Baltimore Stock Exchange to provide benefits upon the death of members of the Exchange is similar to the arrangement or plan established by the constitution of the New York Stock Exchange to provide benefits upon the death of members of that Exchange. Because of such similarity and in view of the holdings in *Commissioner* v. *Treganowan, supra,* and in *Estate of William E. Edmonds, supra,* that the arrangement established by the New York Stock Exchange constituted insurance upon the lives of members of that Exchange, we conclude that the arrangement established by the Philadelphia-Baltimore Stock Exchange constituted insurance upon the lives of members of such Exchange.

Since its inception the Gratuity Fund involved herein has been operated exclusively to provide benefits upon the death of a member of the Exchange and only members of the Exchange are entitled to the benefits provided by the Fund. From a consideration of those facts in connection with the other facts relating to the Fund, we are of the opinion that the Fund constituted an association in which the members of the Exchange were associates, and that the Fund was constituted to engage in and has engaged exclusively in the business of maintaining insurance upon the lives of members of the Exchange. Accordingly, we hold that for present purposes the Gratuity Fund is an insurance association and hereinafter will be regarded and sometimes referred to as an insurance company.

The respondent takes the position that if the Gratuity Fund is held to be an insurance company it should be further held that it was not a mutual insurance company. In support of his position the respondent contends that an essential element of a mutual insurance company is that it provide insurance at cost to its members, and that the Gratuity Fund does not provide insurance at cost to the members of

the Exchange because (1) the payments made to the Gratuity Fund by persons becoming members of the Exchange since 1918 have been entirely unrelated to the cost of insurance, (2) there is no evidence that any excess of payments made to the Gratuity Fund over cost of insurance was ever returned to the members of the Exchange, and (3) the constitution of the Exchange, which governs the operation of the Gratuity Fund, makes no provision for the return to members of any excess of payments over the cost of insurance. The respondent does not make any argument respecting the origin of the "Capital" or net assets of the Gratuity Fund during the years in questions or prior thereto, nor does he make any contention to the effect that the amount of "Capital" or net assets of the Gratuity Fund, the Fund not having maintained any reserves, was more than adequate or sufficient to provide security to the members of the Exchange with respect to the benefits to which they were entitled.

The Codes of 1939 and 1954 do not define a mutual insurance company. However, among the characteristics of such an organization are the common equitable ownership of the assets by the members which may at their option be transferred into legal title and reduced to possession by the dissolution of the company; the right of all policyholders to be members to the exclusion of other persons and to choose the management; the conduct of the business to the sole end that the cost of the insurance be reduced; and the right of the members to a return of the premiums paid in excess of the amounts necessary to cover losses and expenses. *Holyoke Mutual Fire Insurance Co.*, 28 T.C. 112; *Mutual Fire, Marine & Inland Insurance Co.*, 8 T.C. 1212. A mutual insurance company may properly retain from its earnings an amount sufficient to secure its policyholders in the future as well as the present and to cover any contingencies that may be fairly anticipated. *Order of Railway Employees*, 2 T.C. 607, appeal dismissed 143 F. 2d 597. Also, the use of high premium rates would enable a company to make returns of premiums, while the use of low rates might make this impracticable, in either case the insurance being furnished at cost. *Mutual Fire, Marine & Inland Insurance Co., supra.*

The petitioners concede that an essential of a mutual insurance company is the providing of insurance at cost but contend that the matters relied on by respondent are insufficient to prevent the Gratuity Fund from being a mutual insurance company.

In support of his contention that payments made to the Gratuity Fund by persons becoming members of the Exchange since 1918 have been entirely unrelated to the cost of insurance, the respondent states that such payments have been the same, namely, Gratuity Fund initiation fee of $100 and a payment of $20 upon the death of a member of the Exchange (payment of $20 waived since 1949) regardless of the benefits such persons became entitled to or their ages at

the time of becoming members of the Exchange. The evidence shows that from September 1886 until May 1, 1918, or for a period of more than 31 years, all persons becoming members of the Exchange were entitled to the same amount of benefit but that the amount of the Gratuity Fund initiation fee required was dependent upon age, being less for younger persons than for older persons. The amount payable to the Gratuity Fund upon the death of a member of the Exchange was the same for all persons irrespective of their ages. For the period from May 1, 1918, to May 1, 1944, or a period of 26 years, all persons becoming members of the Exchange paid the same amount of Gratuity Fund initiation fee, $100, the same amount upon the death of a member of the Exchange, $20, and became entitled to the same amount of benefit, $4,000. To the extent of this 26-year period the respondent's statement is factually accurate. For the period since May 1, 1944, to the present time, each person admitted to membership in the Exchange has paid the same amount of Gratuity Fund initiation fee, $100, and the same amount upon the death of a member, $20 (except that the payment of $20 has been waived since 1949), but the amount of benefits he became entitled to has been dependent upon his age at the time of admission, ranging from $3,500 for the youngest age group to $1,000 for the oldest age group. To the extent that the respondent's statement represents that all persons admitted to membership in the Exchange since May 1, 1944, have acquired the same benefit regardless of their age at the time of becoming a member, it is factually erroneous. From the foregoing it is apparent that from May 1, 1945, and throughout the taxable years here involved, as well as since, age has been the controlling factor in determining the amount of benefit one admitted to membership in the Exchange during such period became entitled to upon admission.

It is true as the respondent states that there is no evidence that there was ever returned by the Gratuity Fund to members of the Exchange any excess of payments over cost of insurance. We find no indication from the record that there ever was such an excess. It is true that at the beginning of 1953, the first of the taxable years in question, the Gratuity Fund had "Capital" or net assets in the amount of $320,652.25, that that item increased to $333,695.19 at the end of 1953, declined to $325,614.13 at the end of 1954, and further declined to $322,501.05 at the end of 1955. However, since the respondent does not contend that any portion of these amounts had originated by the Gratuity Fund retaining and not returning to members of the Exchange amounts which represented the excess of payments made by the members over the actual cost of insurance and since he does not contend that the amounts of "Capital" in question were more than adequate or sufficient to provide security to the members of the Exchange with respect to the benefits to which they were entitled, we

deem it unnecessary to consider this phase of the respondent's position further.

It is also true as the respondent states that the constitution of the Exchange makes no provision for the return to members of any excess of payments over the cost of insurance. We think it is also true that under the constitution of the Exchange the members have the equitable ownership of the assets of the Gratuity Fund, which may at their option be transferred into legal title and reduced to possession by the dissolution of the Gratuity Fund. In *Order of Railway Employees, supra*, it was pointed out that there is no specific time fixed by the revenue law or indicated by court decisions within which excess premiums must be returned. In that case it was said: "The members, and they alone, are entitled to all dividends, whether resulting from current operations or paid upon dissolution and whether they are true dividends or only excess premiums paid." The foregoing principle was reaffirmed in *Property Owners Mutual Insurance Co.*, 28 T.C. 1007, 1017.

The fact that upon dissolution some of the members of the Exchange might receive from the Gratuity Fund amounts attributable to payments made by persons who are no longer members does not prevent the Gratuity Fund from being a mutual insurance company for tax purposes. *Order of Railway Employees, supra.*

On the factual situation presented and in view of what has been said above we are of the opinion that the Gratuity Fund was a mutual insurance company for tax purposes during the taxable years in question.

The respondent contends that if the Gratuity Fund is held to be a mutual insurance company then it should be held to be a mutual life insurance company taxable under section 201 of the 1939 Code and section 802 of the 1954 Code.

Section 201(b) of the 1939 Code, pertinent portions of which are set out below,[2] contains a definition of the term "life insurance company" as that term is used in chapter 1 of that Code which relates to the income tax. Section 201(c)(2) of that Code, pertinent portions of which are set out below,[3] defines "life insurance reserves"

---

[2] I.R.C. 1939:

SEC. 201. LIFE INSURANCE COMPANIES.

(b) DEFINITION OF LIFE INSURANCE COMPANY.—When used in this chapter [Chapter 1—Income Tax], the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, and the life insurance reserves (as defined in subsection (c)(2)) plus unearned premiums and unpaid losses on noncancellable life, health, or accident policies not included in life insurance reserves, of which comprise more than 50 per centum of its total reserves. * * *

[3] I.R.C. 1939:

as that term is used with respect to life insurance companies. Section 801 of the 1954 Code, pertinent portions of which are set out below,[4] contains a definition of the term "life insurance company" as that term is used in subtitle A of that Code which relates to the income tax. Section 803(b) of the 1954 Code, pertinent portions of which are set out below,[5] defines "life insurance reserves" as that term is used with respect to life insurance companies.

A comparison of the above-mentioned portions of the Codes shows that the definitions of a "life insurance company" contained in the

---

SEC. 201. LIFE INSURANCE COMPANIES.

(c) OTHER DEFINITIONS.—In the case of a life insurance company—

\*     \*     \*     \*     \*     \*     \*

(2) LIFE INSURANCE RESERVES.—The term "life insurance reserves" means amounts which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies. Such life insurance reserves, except in the case of policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation and except as hereinafter provided in the case of assessment life insurance, must also be required by law. In the case of an assessment life insurance company or association the term "life insurance reserves" includes sums actually deposited by such company or association with State or Territorial officers pursuant to law as guaranty or reserve funds, and any funds maintained under the charter or articles of incorporation or association, or bylaws approved by State Insurance Commissioner of such company or association exclusively for the payment of claims arising under certificates of membership or policies issued upon the assessment plan and not subject to any other use.

[4] I.R.C. 1954:

SEC. 801. DEFINITION OF LIFE INSURANCE COMPANY.

For purposes of this subtitle [Subtitle A—Income Taxes], the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if its life insurance reserves (as defined in section 803(b)), plus unearned premiums and unpaid losses on noncancellable life, health, or accident policies not included in life insurance reserves, comprise more than 50 percent of its total reserves. \* \* \*

[5] I.R.C. 1954:

SEC. 803. OTHER DEFINITIONS AND RULES.

(b) LIFE INSURANCE RESERVES.—The term "life insurance reserves" means amounts which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies. Such life insurance reserves, except in the case of policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation and except as hereinafter provided in the case of assessment life insurance, must also be required by law. In the case of an assessment life insurance company or association, the term "life insurance reserves" includes sums actually deposited by such company or association with State or Territorial officers pursuant to law as guaranty or reserve funds, and any funds maintained under the charter or articles of incorporation or association (or bylaws approved by a State insurance commissioner) of such company or association, exclusively for the payment of claims arising under certificates of membership or policies issued on the assessment plan and not subject to any other use.

respective Codes are substantially identical and also that the definitions of "life insurance reserves" are substantially identical.

In order for an insurance company to be a life insurance company within the definitions of the Codes it must (1) be engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, and (2) its life insurance reserves as defined in the quoted provisions of the Codes plus its unearned premiums and unpaid losses on noncancellable life, health, or accident policies not included in life insurance reserves, must comprise more than 50 per cent of its total reserves. But the life insurance reserves referred to are defined as amounts (1) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and (2) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies. In the case of an assessment life insurance company or association, the term "life insurance reserves" includes sums actually deposited by such company or association with State or Territorial officers pursuant to law as guaranty or reserve funds, and any funds maintained under the charter or articles of incorporation or association or bylaws approved by the State insurance commissioner of such company or association exclusively for the payment of claims arising under certificates of membership or policies issued upon the assessment plan and not subject to any other use.

The parties have stipulated that the Gratuity Fund does not maintain any fund or reserve computed or estimated on the basis of recognized mortality or morbidity tables to provide for the payment of death benefits upon the death of a member of the Exchange; that the Gratuity Fund does not maintain a reserve exclusively to provide for the payment of death benefits upon the death of a member of the Exchange; and that it does not deposit any sum with any State or Territorial officers. The Gratuity Fund was established by and has continuously operated pursuant to the constitution of the Exchange. We find nothing in the constitution of the Exchange which either requires or authorizes the segregation of or the holding of any portion or percentage of the funds of the Gratuity Fund exclusively for the payment of death benefits upon the death of a member of the Exchange and not subject to any other use. The evidence shows that the Gratuity Fund has a substantial amount of operating expenses each year. There is nothing in the constitution of the Exchange which would

prevent the payment of such expenses from any funds held in the Gratuity Fund.

In view of the factual situation presented and the definitions of a life insurance company contained in sections 201(b) and 801 of the Codes of 1939 and 1954, respectively, we are of the opinion, and so hold, that the Gratuity Fund was n >t a life insurance company within the meaning of that term as used in those sections of the Codes and consequently was not taxable as a life insurance company.

The petitioners contend that if the Gratuity Fund is subject to taxation, it is taxable as a mutual insurance company other than life or marine under the provisions of section 207 of the 1939 Code and section 821 of the 1954 Code.[6] However, they contend that the Fund had no tax liability for the years in question because its total gross receipts from all sources during each of the taxable years in question were less than $75,000 and that mutual insurance companies other than life or marine with total gross receipts of less than $75,000 are exempted from tax by the provisions of sections 101(11) of the 1939 Code and 501(c)(15) of the 1954 Code.[7]

Respecting the classification of insurance companies for purposes of taxation made by the Code of 1939 the court in *Thompson* v. *White River Burial Association*, 178 F. 2d 954 (C.A. 8) said:

For the purpose of Federal taxation insurance companies are divided into three separate and distinct groups. These groups are (1) life insurance com-

---

[6] I.R.C. 1939:

SEC. 207. MUTUAL INSURANCE COMPANIES OTHER THAN LIFE OR MARINE.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year upon the income of every mutual insurance company (other than a life or a marine insurance company or a fire insurance company subject to the tax imposed by section 204 and other than an interinsurer or reciprocal underwriter) a tax computed [as thereinafter provided] * * *

I.R.C. 1954:

SEC. 821. TAX ON MUTUAL INSURANCE COMPANIES (OTHER THAN LIFE OR MARINE OR FIRE INSURANCE COMPANIES ISSUING PERPETUAL POLICIES).

(a) IMPOSITION OF TAX ON MUTUAL COMPANIES OTHER THAN INTERINSURERS.—There shall be imposed for each taxable year on the income of every mutual insurance company (other than a life or a marine insurance company or a fire insurance company subject to the tax imposed by section 831 and other than an interinsurer or reciprocal underwriter) a tax computed [as thereinafter provided] * * *

[7] I.R.C. 1939:

SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.

The following organizations shall be exempt from taxation under this chapter—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(11) Mutual insurance companies or associations other than life or marine (including interinsurers and reciprocal underwriters) if the gross amount received during the taxable year from interest, dividends, rents, and premiums (including deposits and assessments) does not exceed $75,000;

I.R.C. 1954:

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a)

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(15) Mutual insurance companies or associations other than life or marine (including interinsurers and reciprocal underwriters) if the gross amount received during the taxable year from interest, dividends, rents, and premiums (including deposits and assessments) does not exceed $75,000.

panies presently taxable under section 201 of the Internal Revenue Code * * * (2) insurance companies other than life or mutual taxable under section 204, and (3) mutual insurance companies other than life or marine taxable under section 207. * * *

The Code of 1954 also divides insurance companies into three separate and distinct groups for income tax purposes. These groups are (1) life insurance companies taxable under section 802, (2) mutual insurance companies (other than life or marine or fire insurance companies issuing perpetual policies) taxable under section 821, and (3) insurance companies (other than life or mutual), mutual marine insurance companies, and mutual fire insurance companies issuing perpetual policies taxable under section 831.

We have concluded above that the Gratuity Fund is a mutual insurance company but that it is not a life insurance company within the definitions of a life insurance company as set out in the Codes. No contention is made nor does the record afford any basis for concluding that the Fund is a fire insurance company or a marine insurance company, either mutual or otherwise. As a consequence, we conclude that for 1953 the Gratuity Fund was a mutual insurance company other than life or marine within the purview of section 207 of the Code of 1939 and that for the years 1954 and 1955 it was a mutual insurance company (other than life or marine or fire) within the purview of section 821 of the Code of 1954. Although sections 207 and 821 impose taxes on the incomes of insurance companies of the type we hold the Gratuity Fund to be, section 101(11) of the Code of 1939 and section 501(c)(15) of the Code of 1954 provide that mutual insurance companies other than life or marine whose gross receipts during the taxable year from certain specified sources do not exceed $75,000 shall be exempt from such taxes. Since the Gratuity Fund was a mutual insurance company other than life or marine during the taxable years in question, and since its total gross receipts from all sources during each of the taxable years were less than $75,000, we hold that it was exempt from tax for those years.

Since the Gratuity Fund is exempt from tax for the years in question, it becomes unnecessary to determine whether payments made by the Fund to distributee-beneficiaries of deceased members of the Exchange constituted allowable deductions in computing the taxable income of the Fund and it also becomes unnecessary to determine whether for the years in question Gratuity Fund initiation fees paid by members of the Exchange to the Fund constituted taxable income of the Fund.

Upon the death of Clarence L. Moyer in 1950 the trustees of the Gratuity Fund in 1950 paid to his widow, Lena W. Moyer, $7,500, the amount she was entitled to receive under the constitution of the Exchange. The respondent determined that the entire $7,500 constituted taxable income to her for 1950. Upon the death of William K. Bar-

clay in 1954, the trustees of the Gratuity Fund in 1954 paid to each of the following persons $1,500, representing the amounts they were entitled to receive under the constitution of the Exchange: Charles B. Barclay, H. Gilroy Damon, guardian for William K. Barclay III, Marian B. Johnson, and Virginia B. Bentley. The respondent determined that of the $1,500 distributed or paid to each of the foregoing individuals, $1,108.42 constituted taxable income to them for 1954. Upon the death of William K. Barclay, Jr., in 1954 the trustees of the Gratuity Fund in 1954 paid to his then widow, Maxine W. Barclay (now Maxine W. Darby), $4,000, the amount she was entitled to under the constitution of the Exchange. The respondent determined that of the $4,000, the amount of $2,955.80 constituted taxable income to her for 1954. The foregoing determinations of the respondent were based on his determination that the Gratuity Fund was a trust and taxable under the provisions of the 1939 and 1954 Codes relating to trusts and that the amounts which he included in the incomes of the respective persons represented income distributed by the Fund as a trust. Neither at the trial nor on brief has respondent made any contention as to how the amounts paid by the Fund are to be treated in the hands of the recipients in the event the Fund is held to be other than a trust.

The petitioners contend that the entire amount of the payments made by the Gratuity Fund to the above-mentioned beneficiaries of Clarence L. Moyer, William K. Barclay, and William K. Barclay, Jr., constituted life insurance and that under the provisions of section 22(b)(1) of the 1939 Code and section 101(a)(1) of the 1954 Code, pertinent provisions of which are set out below,[8] such payments were not includible in the gross income of the beneficiary-recipients.

For an amount to be excludible from income under the provisions of section 22(b)(1) of the Code of 1939 and section 101(a)(1) of the Code of 1954, it must be received "under a life insurance contract" and must be "paid by reason of the death of the insured." Since its establishment in 1876, the Gratuity Fund has been maintained and operated exclusively to provide benefits upon the death of members of the Exchange. Although the arrangement under which the Gratuity Fund provided the benefits in question did not take the form

---

[8] I.R.C. 1939:

SEC. 22. GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

(1) LIFE INSURANCE, ETC.—Amounts received—

(A) under a life insurance contract, paid by reason of the death of the insured;

* * *

I.R.C. 1954:

SEC. 101. CERTAIN DEATH BENEFITS.

(a) PROCEEDS OF LIFE INSURANCE CONTRACTS PAYABLE BY REASON OF DEATH.—

(1) GENERAL RULE.—Except as otherwise provided in paragraph (2) and in subsection (d) [which are without application here], gross income does not include amounts received (whether in a single sum or otherwise) under a life insurance contract, if such amounts are paid by reason of the death of the insured.

of the usual or ordinary life insurance policy or contract, we think it contained the essentials requisite to such a policy or contract and was sufficient to constitute a "life insurance contract" as that term is used in the above-mentioned sections of the Codes. In view of this and since the payments in question were made only upon the death of the insured, they constituted life insurance in the hands of the recipients and as such were not includible in their gross income.

The respondent has determined that under the provisions of section 811(g) of the 1939 Code, as amended by section 404 of the Revenue Act of 1942,[9] the $7,500 paid by the trustees of the Gratuity Fund upon the death of William K. Barclay in 1954 to his beneficiaries was includible in the decedent's gross estate as life insurance.

Consistently with their contention that the amounts paid by the trustees of the Gratuity Fund to the beneficiaries of deceased members of the Exchange constituted life insurance, the petitioners concede that the $7,500 here involved constituted "insurance under policies upon the life of the decedent" within the meaning of that phrase as used in section 811(g)(2). However, they contend that the entire $7,500 is not includible in the gross estate of the decedent as life insurance. The petitioners rest their contention on two grounds: (1) That the decedent did not directly or indirectly pay to the Gratuity Fund any premiums on such life insurance, and (2) that the decedent's incidents of ownership did not extend to the entire $7,500 but extended to only $3,500 of that amount.

Section 811(g)(2) provides for the inclusion in the gross estate of a decedent as life insurance of the amount receivable by all beneficiaries other than the executor as insurance under policies upon the life of the decedent (A) which were purchased with *premiums or other consideration*, paid directly or indirectly by the decedent, in proportion that the amount so paid by the decedent bears to the total premiums paid for the insurance, *or* (B) with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person.

[9] I.R.C. 1939:

SEC. 811. GROSS ESTATE.

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

*    *    *    *    *    *    *

(g) PROCEEDS OF LIFE INSURANCE.—

(1) RECEIVABLE BY THE EXECUTOR.—To the extent of the amount receivable by the executor as insurance under policies upon the life of the decedent.

(2) RECEIVABLE BY OTHER BENEFICIARIES.—To the extent of the amount receivable by other beneficiaries as insurance under policies upon the life of the decedent (A) purchased with premiums, or other consideration, paid directly or indirectly by the decedent, in proportion that the amount so paid by the decedent bears to the total premiums paid for the insurance, or (B) with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. *  *  *

For the inclusion of an amount in the gross estate as life insurance it is not necessary that the provisions of both (A) and (B) of the section be met. It is sufficient if the provisions of either are met.[10]

Respecting the petitioners' position that the decedent, William K. Barclay, did not pay to the Gratuity Fund any premiums on the life insurance in question, it is to be observed that the constitution of the Exchange continuously since the establishment of the Gratuity Fund in 1876 has required that every member of the Exchange upon admission to membership therein make a payment to the Gratuity Fund and further that every member upon the death of another member make an additional payment to the Gratuity Fund. While the amount of the first of the foregoing classes of payments has varied over the years, it has always been larger than the amount of the latter class of payments which also has varied over the years, and which payments, under the constitution of the Exchange, have been waived since 1949. Since the constitution of the Exchange required that members of the Exchange make payment of the foregoing classes of payments to the Gratuity Fund which from the time of its establishment has been operated exclusively to provide benefits upon the death of members of the Exchange, and since it has been held *supra* that the Gratuity Fund is a mutual insurance company, we think the payments made by members of the Exchange to the Gratuity Fund constituted "premiums" within the meaning of the word as used in section 811(g)(2). However, if a more limited meaning is to be ascribed to the word "premiums," we think the term "other consideration" as used in section 811(g)(2) is sufficiently comprehensive to include the payments to the Gratuity Fund.

Inasmuch as it is neither shown nor contended that the decedent did not during the period of his membership in the Exchange, which was from a time prior to May 1918 until his death in July 1954, make all the payments to the Gratuity Fund which were required of him by the constitution of the Exchange during that period, we assume that he made all such payments. Since such payments constituted premiums or other consideration within the meaning of section 811(g)(2) and since it does not appear that any other premiums or consideration were paid by another, we conclude that the entire $7,500 paid by the trustees of the Gratuity Fund to beneficiaries of William K. Barclay was includible in his gross estate as life insurance.

Having reached the foregoing conclusion it becomes unnecessary to determine whether $7,500 or only a portion thereof was includible in the gross estate of William K. Barclay, on account of exercisable incidents of ownership possessed by him at his death.

In determining the deficiency in estate tax against the Estate of William K. Barclay, the respondent determined that $16,479.07 of a

[10] H. Rept. No. 2333, 77th Cong., 1st Sess., 1942–2 C.B. 491; S. Rept. No. 1631, 77th Cong., 2d Sess., 1942–2 C.B. 676.

**538**

deduction taken for administration expenses was not deductible in determining the net estate and disallowed that portion of the deduction. Pursuant to stipulation of the parties we have found that of the $16,479.07, $15,426.15 represented administration expenses. It is therefore properly deductible in determining the net estate. In the absence of evidence showing what the remainder of the $16,479.07 or $1,052.92 represented, we sustain the respondent's disallowance of the deduction to the extent of $1,052.92.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*